Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOLLIJOY CARTER, BRADLEY BARNES, and ANTONETT FOY, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE GLOBAL, INC., COINBASE, INC., COINBASE ASSET MANAGEMENT, LLC, and BRIAN ARMSTRONG,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs Mollijoy Carter ("Carter"), Bradley Barnes ("Barnes"), and Antonett Foy ("Foy") (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, upon information and belief where facts are solely in possession of Defendants and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a nationwide class action on behalf of a class consisting of all persons and entities other than Defendants[1] that purchased or otherwise acquired the Digital Asset Securities (including, but not limited to, Coinbase Earn, ALGO, MANA, MATIC, NEAR, SOL, UNI, XLM, and XTZ) from January 1, 2017 through the commencement of this action (the "Class Period").[2] Plaintiffs pursue claims against Defendants under the laws of California and Florida.

2.      Defendant Coinbase (defined below), purports to be "a trusted platform that makes it easy for people and institutions to engage with crypto assets, including for trading, staking, safekeeping, spending, and fast, free global transfers." Further, Defendant Coinbase states that "[to]gether with the crypto community, we also advocate for responsible rules to make the benefits of crypto available around the world."

---

[1] Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.
[2] Plaintiffs reserve the right to modify, change, or expand the class definitions set forth above based on further investigation and discovery.

CLASS ACTION COMPLAINT

3.    However, Defendants instead flouts the securities laws of California, Florida, and elsewhere.

4.    Indeed, throughout the Class Period, Defendant Coinbase admitted in its own User Agreement that it is a "Securities Broker," that the Digital Asset Securities (defined below) sold by and through Defendant Coinbase are "financial assets" (investment contracts or other securities under CAL. COM. § 8102), that Defendant Coinbase is a "securities intermediary" (a clearing corporation or a broker other person that "maintains securities accounts for others and is acting in that capacity"), and that the digital asset wallets custodially held by Defendant Coinbase are "securities account[s]."

5.    When Defendant Coinbase filed with the states and the U.S. Securities and Exchange Commission ("SEC") to become a public company a few years ago, it disclosed that its business involved selling securities but that it was not registered to do so.

6.    However, Defendants have never registered Coinbase, its people, or the Digital Asset Securities Defendants sold (and sell).

7.    As a result of Defendants' wrongful acts and omissions, Plaintiffs seek recission and statutory damages under state law and injunctive relief.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states.

CLASS ACTION COMPLAINT

9.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. § 1965. Defendant Coinbase transacts business in, is found in, and/or has agents in this District. Defendant Coinbase's headquarters was located in this Judicial District until the COVID-19 pandemic and Coinbase declaring it was "remote-first" with no headquarters.[3] Defendants conduct business in this Judicial District and a significant portion of Defendants' activities took place within this Judicial District.

11.     This class action should be assigned to the San Francisco Division of this Court under Civil L.R. 3-2(c-d) because Defendant Coinbase was officially headquartered in San Francisco County and currently maintains offices in San Francisco County. A substantial part of the actions and omissions giving rise to the claims herein occurred in San Francisco County. Additionally, the Company maintains offices in San Mateo County.

12.     Plaintiffs satisfy all conditions precedent for bringing the class action claims alleged herein in this Judicial District.

## **PARTIES**

### *Plaintiffs*

13.     Plaintiff Carter is a resident and citizen of Jamestown, California. Plaintiff Carter invested in many Digital Asset Securities, including, but not limited to, Coinbase Earn, MATIC,

---

[3] *See e.g.*, https://web.archive.org/web/20240529155129/https://www.coinbase.com/blog/how-companies-will-work-post-covid19-embracing-a-remote-first-culture; https://web.archive.org/web/20240604145257/https://www.coinbase.com/blog/coinbase-is-a-decentralized-company-with-no-headquarters.

CLASS ACTION COMPLAINT

NEAR, SOL, UNI, and XLM, through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

14.    Plaintiff Barnes is a resident and citizen of Santee, California. Plaintiff Barnes invested in many Digital Asset Securities, including, but not limited to, Coinbase Earn, MATIC, NEAR, SOL, and XLM, through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

15.    Plaintiff Foy is a resident and citizen of Port St. Lucie, Florida. Plaintiff Foy invested in many Digital Asset Securities through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

***Defendants***

16.    Defendant Coinbase Global, Inc. ("Coinbase Global") is a Delaware corporation with no formal physical principal executive offices. According to Coinbase Global's most recent annual report filed with the U.S. Securities Commission ("SEC") on Form 10-K "communications required to be sent to our principal executive offices may be directed to the email address: secretary@coinbase.com, or to our agent for service of process at Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808."[4] Coinbase Global is listed on the NASDAQ and is a holding company for Coinbase-related subsidiaries. Coinbase Global's principal assets are its interests in the equity of Coinbase, Inc.

17.    Defendant Coinbase, Inc. is a Delaware corporation and a subsidiary of Coinbase Global. Coinbase, Inc. Coinbase, Inc. purports to provide trading and custodial services relating to the Digital Asset Securities.

---

[4] https://www.sec.gov/Archives/edgar/data/1679788/000167978824000022/coin-20231231.htm.

CLASS ACTION COMPLAINT

18.    Defendant Coinbase Asset Management, LLC ("CBAM") is a Delaware corporation and a subsidiary of Coinbase Global. CBAM's principal office is located at 2200 Atlantic Street, Suite 320, Stamford, CT 06902.

19.    Defendants Coinbase Global, Coinbase, Inc., and CBAM are sometimes referred to herein collectively as the "Coinbase."

20.    Defendant Brian Armstrong ("Armstrong") is a co-founder of Coinbase and serves as Coinbase Global's Chief Executive Officer ("CEO") and Chair. On information and belief, Defendant Armstrong is a resident of Los Angeles County, California.

21.    Defendants Coinbase and Armstong are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background on Blockchain and Digital Asset Securities

22.    Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third-party intermediaries.

23.    Blockchains enable the existence of digital assets (also known as cryptocurrencies, tokens, and many other names) ("Digital Asset Securities") by allowing participants to confirm transactions without the need for a formal central certifying authority. When a participant requests a transaction, a peer-to-peer computer network consisting of nodes validates the transaction and the user's status using known algorithms. After the transaction is verified, it is combined with other transactions to create a new block of data for the ledger. The new block is added to the existing blockchain in a way that is permanent and unalterable, thereby completing the transaction. As each new block refers back to and "connects" with the

CLASS ACTION COMPLAINT

immediately prior block associated with it, the addition of a new block adds to the blockchain in a manner similar to a new link being added to a chain.

24.    Digital assets are a medium of exchange or store of value that uses encryption techniques to control the creation of units and to verify the transfer of units. Digital assets can offer lower cost and faster peer-to-peer payment options. Every transaction, and the ownership of every digital asset in circulation, is recorded on the blockchain, which effectively contains a record of all accounts and balances.

25.    Each account on a blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key, which is to be kept secret, like a password. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing control of ownership.

26.    Units of digital assets can be converted to fiat currencies, such as the U.S. dollar, or other digital assets at rates determined on various exchanges (like Coinbase). Digital asset prices are quoted on various exchanges and can demonstrate extreme volatility.

27.    The market for digital assets has been growing exponentially. In 2017, there were an estimated 2.7 million users of digital assets, whereas today estimated users are 100 million.

**Background on Defendant Coinbase**

28.    Defendant Coinbase was founded over decade ago. Since its founding, Defendant Coinbase, including through affiliates not named above, has operated as a securities exchange and broker/dealer.

29.    At least two licensed securities broker/dealer are wholly owned by Defendant Coinbase. One is Coinbase Securities, Inc. ("Coinbase Securities"), another subsidiary of

Defendant Coinbase. Coinbase Securities is registered as a securities broker/dealer with the Financial Industry Regulatory Authority ("FINRA") and the State of Florida's Office of Financial Regulation (the "OFR").

30.    Defendant Coinbase offers and sells securities to the public in the form of Digital Asset Securities. Defendant Coinbase operates two brokerage platforms: Coinbase (the "Coinbase Brokerage Platform") and Coinbase Pro (the "Coinbase Pro Brokerage Platform") (together the "Coinbase Brokerage Platforms").

31.    Defendant Coinbase, like Western Union and its peers, has "money transmitter licenses" in many states. Defendant Coinbase has never been registered as a broker/dealer, bank, investment advisor, trust company, or other regulated financial institutions.

32.    Defendant Coinbase, regardless of the truth, has consistently touted itself as among other positive markers of legality and stability: "regulated", "trusted", and a "broker".

33.    As part of Defendants' efforts to appear regulated like traditional public financial companies, among other things, Defendant Coinbase's written trading rules, protocols, ability to exercise discretion to maintain orderly markets, appear strikingly similar to those of competing securities broker/dealers (e.g., orders, limit orders, market orders, stop orders, order protections, market maker activities, etc.).

34.    Indeed, Defendant Coinbase operates as a prime broker, as another example of Defendants' deceptive practice of wrapping Coinbase in the traditional language of securities brokers, transactions, and registrations while flouting compliance.

35.    Indeed, Defendant Coinbase's User Agreement also uses the same securities terms, general language, and protocols that other and even traditional securities broker/dealers use to further portray itself to the public and Class as a trusted and compliant financial industry

enterprise where it and the investments it offers are fully registered and compliant with applicable state and federal laws, regulations, and regulators. As discussed more thoroughly throughout, this portrayal was and is false.

36. Defendant Coinbase also acts as a "Prime Broker" like other securities broker/dealers. A prime brokerage arrangement is much different than a traditional account relationship *and is even more highly regulated*. The SEC issued a No-Action Letter dated January 25, 1994[5] which was then adopted by the New York Stock Exchange ("NYSE")[6], which specifies conditions that must be met by prime brokers, executing brokers (including Defendant Coinbase), and customers in prime brokerage arrangements.

37. Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for substantial retail and institutional investors who are active market participants. Prime brokerage involves three distinct parties: the prime broker, the executing broker, and the customer. The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.

38. Defendant Coinbase cannot act like a traditional broker/dealer and a traditional prime broker while at the same time pretending to be outside of the coverage of the laws of

---

[5] SEC No-Action Letter to J.C. Bernstein, Prime Broker Committee (January 25, 1994); https://www.sec.gov/divisions/marketreg/mr-noaction/pbroker012594-out.pdf.
[6] NYSE Interpretation Memo 94-6 Feb. 28, 1994; https://www.nyse.com/publicdocs/nyse/markets/nyse/rule-interpretations/1994/94-6.pdf.

CLASS ACTION COMPLAINT

California and Florida—including the California Securities Act and the Florida Securities and Investor Protection Act ("FSIPA"). Defendant Coinbase is required by California and Florida state law to be registered in multiple securities capacities. Defendant Coinbase should today be held to the same standards of a registered broker/dealer and prime broker under the California and Florida securities laws.

39.    Defendant Coinbase, similar to other securities broker/dealers and registered persons, typically acts as a broker (serving as an agent of both buyer and seller in a securities transaction) in transactions with its customers. Defendant Coinbase also reserves the right to act as a dealer (buying and selling securities from and for its own account) at its discretion and with no approvals from its customers. Defendant Coinbase, like a trust company or fiduciary, retains discretion over most related activities.

40.    Defendant Coinbase publicly solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its and other websites, in social media (advertising), and traditional advertising including site-crashing Super Bowl commercials.[7] At all times, Defendant Coinbase was (and is) soliciting the public, the Plaintiffs, the Class, and its then-future and current customers to invest in Digital Asset Securities. Defendant Coinbase has not offered any use-case but investing to Plaintiffs or the Class. (Indeed, there is other no use-case for the Digital Asset Securities). However, Defendant Coinbase continues to disseminate similar investment solicitations, advertisements, blog posts, social media posts, bulletins, and other updates to Plaintiffs and Class members.

---

[7] *E.g.*, https://www.theverge.com/2022/2/13/22932397/coinbases-qr-code-super-bowl-ad-app-crash; https://variety.com/2022/tv/news/coinbase-crypto-super-bowl-commercial-qr-code-1235180678/; https://www.youtube.com/watch?v=uJ9pNQrz0fA.

CLASS ACTION COMPLAINT

**Background on Broker-Dealers**

41.    The offer and sale of securities is regulated across the United States, including those who sell securities: broker-dealers.

42.    A "broker-dealer" under California law is as a person that is "engaged in the business of effecting transactions in securities in this state for the account of others or for that person's own account." CAL. CORP. § 25004(a).

43.    Brokers typically assist issuers seeking to conduct securities offerings and investors seeking to buy or sell securities during either an offering or on the secondary market – often in exchange for transaction-based compensation.

44.    Under Florida law, any person operating as a broker or dealer in U.S. securities markets must register with the state. FLA. STAT. § 517.12(1). To become a registered dealer, associated person, or investment adviser, the applicant must file a written application with the State of Florida. *Id*.

45.    Under Florida law, a "money transmitter" is defined as an entity "qualified to do business in this state which receives currency, monetary value, a payment instrument, or virtual currency for the purpose of acting as an intermediary to transmit currency, monetary value, a payment instrument, or virtual currency from one person to another location or person by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country." FLA. STAT. § 560.103; *see also* FLA. STAT. § 560.105 (empowering the OFR to regulate money services businesses).

**The Digital Asset Securities Are Investments and Securities Under California and Florida State Law**

16.    Defendant Coinbase marketed and sold the Digital Asset Securities to Plaintiffs and the Class as "investments". Defendant Coinbase's marketing, advertising, and general solicitation materials are clear and consistent that the only use-case for Digital Asset Securities is for investments.

17.    As one example, Defendant Coinbase in a Coinbase Bytes newsletter[8] dated October 26, 2022 touted how "Wealthy *investors* ages 21 to 43 are 7.5 times more likely to hold crypto than those 43 and older, per a *new survey by Bank of America* that gauged the *investing attitudes of Americans* with over $3 million of investable assets." (Emphasis added.) (Internal hyperlink omitted.)[9]

18.    Defendant Coinbase even admits that it is a "Securities Broker." In particular, in its User Agreement, Defendants make clear that the Digital Asset Securities sold by Defendant Coinbase are "financial assets," (i.e., investment contracts or other securities under CAL. COM. §8102), that it is a "securities intermediary" (i.e., a clearing corporation or a broker other person that "maintains securities accounts for others and is acting in that capacity"), and the Digital Asset Securities wallets custodially held by Defendant Coinbase are "securities account[s]."

19.    Defendant Coinbase's own press release disclosed that the SEC believes that the Coinbase wallets are securities accounts that must be registered as such. Accordingly, both Coinbase and the SEC agree that the Digital Asset Securities described herein are "securities," the sale of which results in strict liability under California and Florida securities laws based on both Defendant Coinbase's sale of the unregistered Digital Asset Securities and Defendant Coinbase's failure to register as a broker/dealer.

20.    Florida state law requires that every offer and sale of securities within the state and/or United States be registered with the Florida Office of Financial Regulation and/or the

---

[8] Coinbase Bytes is described by Defendant Coinbase as "Coinbase's beginner-friendly crypto newsletter. Subscribe for digestible news about Bitcoin, NFTs, business, and culture."
[9] https://www.coinbase.com/bytes/archive/reddit-nft-cryptosnoo-obsession.

SEC, or qualify for an exemption from registration. The objective of the requirement is to ensure that the investing public receives complete and accurate information about securities being offered for sale before they purchase them.

21.    The registration and disclosure regime imposed by state and federal law applies only to the non-exempt offer and sale of securities. The term "security" is broadly defined under FLA. STAT. §517.021(23) and includes any of the following:

(a)    A note.
(b)    A stock.
(c)    A treasury stock.
(d)    A bond.
(e)    A debenture.
(f)    An evidence of indebtedness.
(g)    A certificate of deposit.
(h)    A certificate of deposit for a security.
(i)    A certificate of interest or participation.
(j)    A whiskey warehouse receipt or other commodity warehouse receipt.
(k)    A certificate of interest in a profit-sharing agreement or the right to participate therein.
(l)    A certificate of interest in an oil, gas, petroleum, mineral, or mining title or lease or the right to participate therein.
(m)    A collateral trust certificate.
(n)    A reorganization certificate.
(o)    A preorganization subscription.
(p)    A transferable share.
(q)    An investment contract.
(r)    A beneficial interest in title to property, profits, or earnings.
(s)    An interest in or under a profit-sharing or participation agreement or scheme.
(t)    An option contract that entitles the holder to purchase or sell a given amount of the underlying security at a fixed price within a specified period of time.
(u)    Any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, or certificate.
(v)    A receipt for a security, or for subscription to a security, or a right to subscribe to or purchase any security.
(w)    A viatical settlement investment.

46.    The term "investment contract" included within the statutory definition of security is not defined within Florida law nor the federal Securities Act of 1933, 15 U.S.C. § 77a, *et seq*. The Eleventh Circuit has, however, interpreted the meaning of an "investment contract" as applied to digital assets and applied the test for distinguishing an investment contract from

CLASS ACTION COMPLAINT

other commercial dealing set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). *See e.g., Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021). In *Howey*, the U.S. Supreme Court found that an "investment contract" exists when there is (1) the investment of money; (2) in a common enterprise; with (3) the expectation of profits to be derived solely from the efforts of others. *See e.g., Fedance*, 1 F.4th at 1288 (quoting *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) ).

## The Digital Asset Securities Are Securities

47.     Defendants have, early and often, recognized the significant impact classifying digital assets, like the Digital Asset Securities, as securities would have on the operation of the Coinbase. Due to the huge implications of classifying digital assets, like the Digital Asset Securities, as securities Defendants have, early and often, chosen to, or attempt to appear willfully blind, to not register the securities, persons, or broker-dealers as required by (California and Florida state) law.

48.     On December 7, 2016, Defendant Coinbase first posted its (now deleted) "A Securities Law Framework for Blockchain Tokens" (the "Securities Law Framework Post"). In the Securities Law Framework Post, Defendants correctly noted "For example, ***some tokens, depending on their features, may be subject to US federal or state securities laws. This would mean, among other things, that it is illegal to offer them for sale to US residents except by registration or exemption.*** Similar rules apply in many other countries." (Emphasis added.)[10]

49.     Defendant Coinbase's Securities Law Framework Post set out: (1) to estimate how likely a particular token is to be a security under U.S. federal securities law; (2) some best

---

[10] https://web.archive.org/web/20170513053225/https://www.coinbase.com/legal/securities-law-framework.pdf.

CLASS ACTION COMPLAINT

practices for crowdsales; and (3) a detailed securities law analysis. The Securities Law Framework Post was given to issuers of digital assets seeking to be listed on Defendant Coinbase's platforms.

50.    In a similar vein, to promote the sale of Digital Asset Securities on Coinbase and further obscure the regulatory status of the Digital Asset Securities sold on Coinbase, Defendant Coinbase created the Crypto Rating Council (the "CRC") in September 2019. Defendant Coinbase then touted the CRC as "a member-operated organization formed to assist market participants that trade or support crypto assets to comply with U.S. federal securities laws."[11]

51.    The CRC purports to have "distilled a set of yes or no questions which are designed to plainly address each of the four Howey test factors: whether crypto purchasers (i) invested money, (ii) in a 'common enterprise', (iii) with a reasonable expectation of profit, and (iv) based on the efforts of others."[12] The CRC gives each digital asset it reviews "a final rating between 1 and 5. A score of 5 results when an asset appears to have many characteristics that are consistent with the Howey-test factors. A score of 1 results when an asset appears to have few characteristics that are consistent with the Howey-test factors. It is probably less likely, relative to higher-scored assets, to implicate the U.S. securities laws."

52.    Defendants' publication of the Securities Law Framework Post, together with the creation of the CRC and its posting, has continuously and misleadingly suggested to Plaintiffs and Class members that Coinbase would and did not list any digital assets that were securities.

53.    However, Defendants let its greed overrule their judgment when it began listing digital assets that qualify as securities to generate ever-greater fees from Coinbase's customer

[11] https://www.coinbase.com/blog/introducing-the-crypto-rating-council.
[12] https://www.cryptoratingcouncil.com/copy-of-the-framework.

transactions. Defendant Coinbase listed the Digital Asset Securities despite knowing that at least, if not all, were securities.

54. As of June 3, 2024, Defendant Coinbase listed 249 digital assets as "Tradable" on its platforms. During the Class Period, Plaintiffs and Class members invested in Digital Asset Securities through Defendants' platforms by exchanging fiat currency and digital assets for the Digital Asset Securities and paid Coinbase a fee for executing the transactions.

55. Plaintiffs and other Class members are and were Coinbase customers and users and expected to earn profits through the appreciation in value of the Digital Asset Securities, which they expected to result predominantly, if not solely, from the efforts of the Digital Asset Securities' creators, developers, and issuers.

56. The following are very small sampling of the tokens (also called cryptocurrencies and digital assets, among other things) that constitute the Digital Asset Securities that were listed on the Coinbase Digital Asset Platforms and traded by the Class, including Plaintiffs, during the Class Period:

***Coinbase Earn Account***

57. Coinbase Earn accounts are each a Digital Asset Security that was offered and sold on the Coinbase Digital Asset Platforms during the Class Period. Investors in these accounts deposited certain digital assets (including, but not limited to, ADA, ATOM, AVAX, DOT, ETH, POL, SOL, and XTZ) into Coinbase Earn accounts to earn purportedly high yield interest rates.[13] Indeed, the rates advertised by Coinbase were well in excess of the rates concurrently offered on short-term investment-grade fixed income securities or bank savings accounts.

---

[13] *See e.g.*, https://www.coinbase.com/earn; https://help.coinbase.com/en/coinbase/coinbase-staking/staking/eligibility.

CLASS ACTION COMPLAINT

58.     Defendants, after obtaining transfers of digital assets, including Digital Asset Securities, from customers (investors), then pooled those digital assets to fund Defendants' various income generating activities, including: Defendants' proprietary trading, new digital asset issuances, and staking. In exchange for investing in the Coinbase Earn accounts, Defendants promised investors very attractive interest rate that would purportedly be paid regularly in the same type of digital asset, including Digital Asset Securities, as originally invested.

### Algorand (ALGO)

59.     Algorand ("ALGO") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period. ALGO is the native token of the Algorand blockchain.[14]

### Decentraland (MANA)

60.     Decentraland ("MANA") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period.[15]

### Polygon (MATIC)

61.     Polygon f/k/a Matic Network ("MATIC") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period.[16]

---

[14] *See e.g.*, https://www.coinbase.com/price/algorand ("Algorand (ALGO) is a decentralized, blockchain-based network that strives to support a wide range of applications. It was designed with the goal of improving transaction speeds and efficiency, addressing the slow transaction times associated with other blockchains. … Algorand's native cryptocurrency, ALGO, plays a crucial role in the network's operation, with compensation for block creation distributed among all coin holders.").

[15] https://www.coinbase.com/price/decentraland ("Decentraland, represented by the cryptocurrency token MANA, is a virtual reality platform built on the Ethereum blockchain.").

[16] *See e.g.*, https://www.coinbase.com/price/polygon ("Polygon, previously known as Matic Network, is a platform designed to facilitate the development and scaling of Ethereum-based applications.").

CLASS ACTION COMPLAINT

***Near Protocol (NEAR)***

62.    Near Protocol ("NEAR") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period.[17]

***Solana (SOL)***

63.    Solana ("SOL") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period.[18]

***Uniswap (UNI)***

64.    Uniswap ("UNI") is a Digital Asset Security that was (and is) listed on Defendant" platforms during the Class Period.[19]

***Stellar Lumens (XLM)***

65.    Stellar Lumens ("XLM") is a Digital Asset Security that was (and is) listed on Defendants' platforms during the Class Period.[20]

---

[17] *See e.g.*, https://www.coinbase.com/price/near-protocol ("NEAR Protocol provides a conducive environment for decentralized applications (DApps) and aims to create a platform that is both developer and user-friendly.").

[18] *See e.g.*, https://www.coinbase.com/price/solana ("Launched in March 2020 by the Solana Foundation, based in Geneva, Switzerland, Solana is a crypto-computing platform that aims to achieve high transaction speeds without sacrificing decentralization. … Like Ethereum, Solana is both a cryptocurrency and a flexible platform for running decentralized apps (dapps) or minting NFTs, with its cryptocurrency (SOL) available to buy and sell via exchanges like Coinbase.").

[19] *See e.g.*, https://www.coinbase.com/price/uniswap ("Uniswap (UNI) is the largest decentralized exchange (or DEX) operating on the Ethereum blockchain. It allows users anywhere in the world to trade crypto without any intermediary by facilitating automated trading of decentralized finance (DeFi) tokens.")

[20] *See e.g.*, https://www.coinbase.com/price/stellar ("Stellar (XLM) is a decentralized, peer-to-peer network established in 2014 by the Stellar Development Foundation. As a cross-border transfer and payment system that connects financial entities, Stellar aims to unite the world's financial infrastructure, connecting banks, payment systems, and individuals with near-instant and secure transfers at a minimal cost.").

17

*Tezos (XTZ)*

66.    Tezos ("XTZ") is a Digital Asset Security that was (and is) listed on Defendants platforms during the Class Period.[21]

**Coinbase Offered and Sold Securities and Investments to Plaintiffs and the Class**

67.    Throughout the Class Period, and at all relevant times, Defendants have offered and sold securities and investments to the Plaintiffs and Class members.

68.    Defendants have failed to register those persons offering and selling the Digital Asset Securities as associated persons of a broker-dealer and have failed to register as a broker-dealer with the SEC, California, Florida, California, or any other state.

**Coinbase Operates as an Unregistered Broker-Dealer**

69.    Coinbase's activities further meet the definition of a "broker-dealer" under both California and Florida state law.

70.    Throughout the Class Period, Defendant Coinbase operated as a broker by effecting transactions in Digital Asset Securities for Plaintiffs and the Class (users and/or customers) by matching buy and sell orders using the Coinbase matching engine.

71.    Defendants also operated Coinbase as a broker-dealer by facilitating the sale of Digital Asset Securities as part of initial coin offerings ("ICOs").[22]

72.    During the Class Period, Defendant Coinbase operated as a dealer under both California and Florida law by, among other things:

---

[21] *See e.g.*, https://www.coinbase.com/price/tezos ("Tezos (XTZ) is a blockchain network that operates on smart contracts, akin to Ethereum, but with a distinctive feature. It aims to provide an advanced infrastructure that can evolve and improve over time without the risk of a hard fork, a challenge that Bitcoin and Ethereum have faced. Tezos is designed with the intention of being upgradable and enduring.").
[22] *See e.g.*, https://www.coinbase.com/learn/tips-and-tutorials/what-are-initial-coin-offerings-and-how-do-they-work.

(a)    holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for the Digital Asset Securities;

(b)    maintaining custody over Plaintiffs and the Class members' (its customers and users) Digital Asset Securities;

(c)    by providing Plaintiffs and the Class members (its customers and users) services such as allowing purchase of Digital Asset Securities on credit;

(d)    by having a regular turnover inventory of Digital Asset Securities;

(e)    by purchasing Digital Asset Securities for accounts in Coinbase's name (often at a discount to the ICO price); and,

(f)    selling the Digital Asset Securities (and other digital assets) to investors for profit immediately, or at a later time, after being held in inventory.

73.    Defendant Coinbase's activities qualify it as a "broker-dealer" because Defendant Coinbase "means any person engaged in the business of effecting transactions in securities in this state for the account of others or for that person's own account." CAL. CORP. § 25004(a); *see also* FLA. STAT. § 517.211. Defendant Coinbase is not subject to any exemptions for registering as a broker-dealer. *See* CAL. CORP. § 25200; FLA. STAT. § 517.

74.    Defendant Coinbase currently admits that it is a securities broker in the Coinbase User Agreement by noting that that the Digital Asset Securities sold by Defendants are "financial assets", that Defendant Coinbase is a "securities intermediary", and that the Digital Asset Wallets custodially held by Coinbase are each a "securities account".[23]  *See also* FLA. STAT. §517.211.

75.    Defendant Coinbase typically acts as a broker (i.e., serving as an agent of both buyer and seller in a securities transaction) in transactions with the customers, but reserves the

---

[23] https://www.coinbase.com/legal/user_agreement/united_states.

CLASS ACTION COMPLAINT

right to act as a dealer (i.e., buying and selling securities from and for its own account) at its discretion and with no approvals from the customers.

76.    Defendant Coinbase retains discretion over most of the related activities, like a trust company or fiduciary.

77.    Defendants solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its website and in social media advertising, traditional advertising, and even Super Bowl commercials. Throughout the Class Period, and at all relevant times, Defendants were soliciting Plaintiffs and the Class (users and customers) to invest in the Digital Asset Securities that Defendants offered on Defendants' platforms. As noted throughout, there is no use-case but investing for the Digital Asset Securities, and no alternative use-case was offered by Defendants to Plaintiffs and the Class (users and customers).

78.    In violation of California and Florida state securities laws, Defendants have promoted, offered, and sold the Digital Asset Securities knowing they had not been registered as required by law. As a result, Defendants are liable to Plaintiffs and the Class for the full amount of their damages.

79.    Additionally, a digital asset exchange like Coinbase accepts deposits of digital assets and fiat currency (like the U.S. dollar or Mexican peso) on behalf of their customers and users. Importantly, after the digital assets are received by Defendants, Defendants then have full control over those digital assets. Defendants credit the customer account with the appropriate amount of that digital or fiat assets Defendants received. This credit can be regarded as a liability of the exchange to its customer, Plaintiffs and Class members.

80.    The digital assets that Plaintiffs and Class members (users and customers) deposited their own Coinbase account receive a credit from Coinbase, which the customer can

then purportedly take and trade for other digital or fiat assets, leave as a balance on their account, or withdraw purportedly the "same" assets.

81.     However, Plaintiffs and the Class (Coinbase's customers and users) do not control access to the "assets" in their respective accounts. Plaintiffs and the Class (Coinbase's customers and users) must first make a request to Defendants to be able to access and send those "assets" (or more specifically, similar amounts of assets). Coinbase then debits the Plaintiffs' and the Class members' (Coinbase's customers and users) accounts and sends assets. The processing of such requests is dependent on the willingness, ability, and approval of Defendants.

82.     All exchange accounts with any centralized custodial exchange, including the Coinbase accounts at issue here, are custodial in nature. This means that the Plaintiffs and the Class members (Coinbase's customers and users) do not control access to the "assets" "in" their account, Defendants do.

83.     Notably, a Coinbase customer account cannot hold or store digital assets. Instead, the Coinbase customer account stores a record of a liability ("RoL") in connection with the exchange's customer (Plaintiffs and the Class (Coinbase's customers and users)). It is this "RoL" that Plaintiffs and the Class (Coinbase's customers and users) purchased from Defendants during the Class Period.

84.     If Defendants properly registered with the appropriate regulatory bodies in California, Florida, or elsewhere, as required by law, Defendants would have been further required to register with FINRA and be bound by FINRA regulations, which includes a

prohibition against FINRA members seeking to waive class action liability when conducting business as a FINRA member.[24]

**The Class and Plaintiffs' Are Entitled to Damages, Rescission, and Fees**

85.     Even though the Digital Asset Securities are unregistered securities under both the *Howey* test, as adopted in California and Florida, and statutory definitions for the same under state securities laws, and the Coinbase Digital Platforms operate as a broker-dealer under both California and Florida law, Defendants have not registered the Coinbase Digital Asset Platforms as a broker-dealer in either state,

86.     Further, Defendant Coinbase has not registered with FINRA.

87.     California and Florida law afford Plaintiffs and the Class the right, which they hereby pursue, to void their purchase or sale agreements with Defendants and to recover damages, including the fees they have paid under those agreements.

88.     Plaintiffs and the Class additionally seek to void their contracts and recover damages with respect to purchases or sales of Digital Asset Securities on Defendants' platforms.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

89.     Plaintiffs bring this action as a nationwide class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3) on behalf of a class defined as:

> All persons and entities other than Defendants[25] that purchased or otherwise acquired the Digital Asset Securities (including, but not limited to, ALGO, MANA, MATIC, NEAR, SOL, UNI, XLM, and XTZ, as well as Coinbase Earn accounts) from January 1, 2017 through the commencement of this action (the "Class Period").

---

[24]  *See e.g.*, https://www.finra.org/investors/insights/securities-class-action-lawsuits ("FINRA rules also prohibit firms attempting to prevent investors from participating in judicial class actions by adding waiver language to customer account agreements.").

[25]  Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.

90.    Plaintiff Foy brings certain claims on behalf of a subclass of investors who reside in Florida (the "Florida Subclass").

91.    **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Digital Asset Securities were actively traded on and through the publicly-available Coinbase platforms. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Coinbase, or others, and may be notified of the pendency of this action by mail or email or otherwise, using the form of notice similar to that customarily used in class actions.

92.    **Commonality**: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the California securities laws;

(b)    whether Defendants violated the Florida securities laws;

(c)    whether Defendants offered the Digital Asset Securities for sale;

(d)    whether Defendants offered the Digital Asset Securities for sale in violation of the California securities laws;

(e)    whether Defendants offered the Digital Asset Securities for sale that constitute investments under the Florida securities laws;

(f)    whether Defendants operated as a broker-dealer as defined by state and/or federal securities laws; and;

(g)    whether Class members have sustained damages and, if so, what is the proper measure of damages; and,

(h)    whether Class members are entitled to declaratory and/or injunctive relief.

93.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and the Class members' claims all arise out of Defendants' wrongful acts and omissions.

94.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

95.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

96.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

97.    Plaintiffs have satisfied all conditions precedent to having their claims adjudicated on a class-wide basis.

1

## California Law Applies to the Entire Class

2      98.    California's substantive laws apply to every member of the Class, regardless of

3  where in the United States the Class members reside.

4      99.    California's substantive laws may be constitutionally applied to the claims of

5  Plaintiffs and the Class under the Due Process Clause, U.S. CONST. amend XIV, § 1, and the

6  Full Faith and Credit Clause, U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has

7  significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and

8  all Class members, thereby creating state interests that ensure that the choice of California state

9  law is not arbitrary or unfair.

10     100.    While Defendant Coinbase had physical headquarters and principal place of

11  business, it was is located in California. Currently, Defendants maintain multiple physical offices

12  in California and certain Defendants reside in California.

13     101.    On information and belief, Defendants own property and conduct substantial

14  business in California, and therefore California has an interest in regulating Defendants' conduct

15  under its laws. Defendants' decision to reside in California and avail itself of California's laws,

16  and to engage in the conduct discussed herein from and emanating out of California, renders the

17  application of California law to the claims constitutionally permissible.

18     102.    The application of California laws to Plaintiffs and the Class is also appropriate

19  under California's choice of law rules because California has significant contacts to the claims

20  of Plaintiffs and the Class, and California has a greater interest in applying its laws here than any

21  other interested state.

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**COUNT I**
**California Corporate Securities Law of 1968**
**CAL. CORP. §§ 25110 & 25503**
**(Sale of Unregistered Securities)**
**Against Coinbase Global and Coinbase, Inc.**

103.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

104.    Plaintiffs Carter and Barnes are residents of the State of California.

105.    Plaintiffs Carter and Barnes paid for or purchased Digital Asset Securities in California, and thus the unlawful conduct alleged herein occurred in California.

106.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants Coinbase Global and Coinbase, Inc.

107.    Defendants Coinbase Global and Coinbase, Inc., are the primary violators under this cause of action.

108.    The Digital Asset Securities are securities within the meaning of the California Corporations Code.

109.    The Digital Asset Securities were (and are) required to be registered with the Commissioner of Corporations under California law.

110.    Section 25110 makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part." CAL. CORP. § 25110. Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering … shall be an unqualified offer or sale." *Id*.

**CLASS ACTION COMPLAINT**

111.    Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code. CAL. CORP. § 25503. Violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned." *Id*. In the event that a plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorneys' fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id*.

112.    Section 25503 provides that, "if the consideration given for the security is not capable of being returned, shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorney's fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a) the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees; and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id*.

113.    Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section." *Id*.

114.    The Digital Asset Securities have not been registered with the Commissioner, are not exempt from registration, and are not federally covered. No registration statements have been filed with state or federal governmental entities or have been in effect with respect to any of the offerings alleged herein.

115.    Defendants Coinbase Global and Coinbase, Inc., by engaging in the conduct described throughout this complaint and above in this count, directly or indirectly, sold and/or offered to sell securities (the Digital Asset Securities).

116.    Plaintiffs and Class members purchased the Digital Asset Securities from or through Defendants Coinbase Global and/or Coinbase, Inc. The Digital Asset Securities were provided and/or sold into the various Digital Asset Securities liquidity pools by Defendants Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as customers. Thus, by providing Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and Class members made their Digital Asset Securities purchases from the liquidity pool on Coinbase, privity between Defendants Coinbase Global and/or Coinbase, Inc. and plaintiffs is established even in the absence of a direct contract linking the two parties.

117.    Privity also exists between the issuers and suppliers of the liquidity in the pool (Defendants Coinbase Global and/or Coinbase, Inc.) and all those making purchases (Plaintiffs and Class members) from the Coinbase exchange because Defendants are receiving the benefit of fees (a variable buying fee and/or a 1.49% selling fee) per the Digital Asset Securities transactions on Defendants' platforms.

118.    By reason of the conduct herein alleged, each of the Defendants Coinbase Global and Coinbase, Inc. violated Sections 25110 and 25503 of the California Corporations Code.

CLASS ACTION COMPLAINT

1
2
3

## COUNT II
### CAL. CORP. § 25210
### (Unlicensed Broker-Dealer)
### Against Defendants Coinbase Global and Coinbase, Inc.

4
5

119.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

6
7

120.    This Cause of Action is brought on behalf of Plaintiffs and Class members who bought or sold Digital Asset Securities on Defendants' platforms.

8
9
10
11
12
13
14

121.    At all relevant times there was in full force and effect CAL. CORP. § 25210, which prohibits, among other things, any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *See* CAL. CORP. § 25210(a-b). Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. CAL. CORP. § 25501.5(a)(1).

15
16
17
18
19

122.    Upon recission and tender of the Digital Asset Securities, such purchaser is entitled to recover the consideration paid for the Digital Asset Securities plus interest at the legal rate, less the amount of any income received on the Digital Asset Securities. CAL. CORP. § 25501.5(a)(2).

20
21
22
23
24
25

123.    A purchaser who no longer owns the Digital Asset Securities is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Digital Asset Securities by the purchaser. CAL. CORP. § 25501.5(a)(4).

26
27
28

124.    When issued, the Digital Asset Securities were securities within the meaning of the California Securities Act. CAL. CORP. § 25019. Defendant Coinbase transacted business as

a broker-dealer or agent when it offered or sold the Digital Asset Securities to Plaintiffs. CAL. CORP. § 25004.

125.    Defendant Coinbase transacted business as a broker-dealer or agent in California, including, without limitation, through solicitations directed by Defendants to California and received in California.

126.    Defendant Coinbase was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

127.    Therefore, Defendant Coinbase violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

128.    Plaintiffs and Class members therefore seek all available and appropriate relief available under the laws of California (including the California Securities Act), including damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

**COUNT III**
**California Unfair Competition Law (the "UCL")**
**CAL. BUS. & PROF. CODE § 17200**
**(Unlawful Acts and Practices)**
**Against All Defendants**

129.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

130.    Plaintiffs Carter and Barnes are residents of the State of California.

131.    Plaintiffs Carter and Barnes paid for or purchased Digital Asset Securities in California, and thus the unlawful conduct alleged herein occurred in California.

CLASS ACTION COMPLAINT

132.    Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

133.    At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq*., which prohibits, among other things, "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

134.    "'[A]n act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp*., 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc*., 152 Cal. App. 4th 1544, 1554 (2007)).

135.    The UCL is "sweeping, embracing 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 973 P.2d 527, 539 (1999) (quoting *Rubin v. Green* 4 Cal.4th 1187, 1200, 17 Cal.Rptr.2d 828, 847 P.2d 1044 (1993))). "By proscribing 'any unlawful' business practice, 'section 17200 borrows violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." *Id*. (quoting *State Farm Fire & Casualty Co. v. Superior Court* 45 Cal.App.4th 1093, 1103, 53 Cal.Rptr.2d 229 (1996) (abrogated by *Cel-Tech Commc'ns, Inc.*)). In other words, an "unlawful" business practice under the UCL is a practice that violates any other law.

136.    Any violation of broker-dealer laws or the registration requirements for money transmitters (whether under California, Florida, or other laws) necessarily violates the "unlawful" prong of the UCL.

137.    To have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (quoting *Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1104 (9th Cir.2013)).

138.    A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (noting that the "'unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'") (quoting *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D. Cal. 1994)). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id*. (quoting *Bank of the West v. Super. Ct*., 2 Cal. 4th 1254, 1267 (1992)).

139.    Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs and Class members to a grossly unfair degree, including, but not limited to, in the following ways:

(a)    knowingly and intentionally misrepresenting that the Digital Asset Securities sold on Defendants platforms were not securities under state or federal law;

(b)    knowingly and intentionally concealing that Defendants did not, as required by law, register the Digital Asset Securities sold on Defendants' platforms with the necessary state and federal regulatory entities; and,

(c)    knowingly and intentionally concealing that Defendants did not, as required by law, register Defendant Coinbase's business itself with the necessary state and federal regulatory entities.

140.    Defendants failed to disclose that Defendant Coinbase purposefully avoided registering its business and the Digital Asset Securities products with the necessary state (and other) regulatory bodies. Plaintiffs and Class members would have found it material to their decisions to purchase Digital Asset Securities to know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

141.    The facts that the Defendants concealed and obfuscated were material to the decisions of Plaintiffs and Class members about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the Defendants' deceptive, fraudulent, and false acts and practices.

142.    Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. See *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1113-14 (N.D. Cal. 2015) ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants. [] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit.") (internal citation omitted); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1303 (S.D. Cal. 2020) ("a duty to disclose based upon Defendant's exclusive knowledge of the alleged inadequacy of its security measures. Plaintiffs adequately allege that the omission was a material fact.").

143.    Defendant Coinbase's misleading omissions concerning the Digital Asset Securities offered on its platforms relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall v. SeaWorld Ent., Inc.*, 747

CLASS ACTION COMPLAINT

F. App'x 449, 451 (9th Cir. 2018) (quoting *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018)). That is the case here.

144.    Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

145.    Defendants intended for Plaintiffs and Class members to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

146.    Had any of Defendants disclosed the omitted information, Plaintiffs and Class members, would have been aware of it because they follow, directly or indirectly, the social media accounts of and news reports on, Defendants Coinbase and Armstrong.

147.    As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

148.    Taken together, Coinbase's omissions contributed to the deceptive marketing and advertising tactics as a whole, which were used to induce customers to use the Coinbase platforms to purchase the Digital Asset Securities.

149.    In the event that Plaintiffs' broker-dealer and money transmitter claims under California and Florida securities laws are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

CLASS ACTION COMPLAINT

150.    Additionally, Plaintiffs and Class members lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL.

151.    The lack of an adequate remedy at law entitles Plaintiffs and Class members to pursue equitable restitution under the UCL.

152.    Concurrently, "restitution under the CLRA or UCL would be more certain, prompt, or efficient than the legal remedies they request[,]" available with state securities and consumer law claims here. *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)). As an example, the price premium damages model would likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

153.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed.

**COUNT IV**
**California Unfair Competition Law**
**CAL. BUS. & PROF. CODE § 17200**
**(Unfair Acts and Practices)**
**Against All Defendants**

154.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

155.    Plaintiffs Carter and Barnes are residents of the State of California.

156.    Plaintiffs Carter and Barnes paid for or purchased Digital Asset Securities in California and thus the unlawful conduct alleged herein occurred in California.

157.    Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

158.    At all relevant times there was in full force and effect the UCL, CAL. BUS. & PROF. CODE § 17200, *et seq.*, which prohibits, among other things, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

159.    "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

160.    Defendants engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above. Unfair acts under the UCL have been interpreted using different tests, including whether:

> (1) the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions;
> (2) the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and
> (3) the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

161.    Defendants have engaged in, and continue to engage in, conduct that violates the legislatively declared policies of, among other things:

> (1) CAL. CIV. CODE §§ 1572,1573, 1709, 1710, 1711 against committing fraud and deceit;
> (2) CAL. CIV. CODE § 1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and
> (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. § 45(a)(1), against unfair or deceptive practices.

CLASS ACTION COMPLAINT

Defendants gain an unfair advantage over their competitors, whose practices relating to other similar crypto-related products must comply with these laws.

162.    Defendants' affirmative acts in soliciting sales of Digital Asset Securities are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

163.    The gravity of the harm to consumers caused by actions of Defendants far outweighs the utility of their conduct.[26]

164.    Defendants facilitated many long-running crypto "investment opportunity" and scams, causing hundreds of millions (and rising) of dollars of damage to investors and the Class.

165.    The conduct of Defendants was (and is) substantially injurious to consumers. Such conduct caused, and continues to cause, substantial injury and damages to Plaintiffs and the Class members (consumers, customers, users, etc.) because Plaintiffs and Class members would not have continued with the transactions in question but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.

166.    Plaintiffs and the Class members (consumers, customers, users, etc.) overpaid for Digital Asset Securities and the injury alleged herein is not outweighed by any countervailing "benefits" to consumers or competition. No "benefit" to Plaintiffs and the Class members (consumers, customers, users, etc.) or competition results from the alleged conduct of Defendants. Because Plaintiffs and the Class members (consumers, customers, users, etc.)

---

[26] *See e.g.*, https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze (As of June 2022, "Since the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method. The median individual reported loss? A whopping $2,600.") (Footnotes omitted.)

37

CLASS ACTION COMPLAINT

reasonably rely on the representations, and could not have known about the omitted disclosures, and the injurious results from ordinary use of Defendants products and platforms, Plaintiffs and the Class members (consumers, customers, users, etc.) could not have reasonably avoided such injury.

167.    Defendants willfully and knowingly engaged in the deceptive and unfair acts and practices described throughout this complaint and above in this count. Defendants knew or should have known that those acts and practices were unlawful and thus in violation of CAL. BUS. & PROF. CODE § 17200, *et seq*., among other laws.

168.    The facts Defendants omitted, obfuscated, and concealed were material to the decisions of Plaintiffs and Class members about whether and how much to pay for the Digital Asset Securities, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

169.    Defendants' conduct harmed competition. While Defendants cut corners and minimized their costs, Defendants' competitors spent the time and money necessary to promote financial products, including various forms of digital assets, that complied with the applicable laws. Further, the injuries suffered by Plaintiffs and the Class are not outweighed by any countervailing benefits to consumers or competition.

170.    In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid*, 780 F.3d at 958 (quoting *Hinojos,* 718 F.3d at 1104. A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman*, 68 F.3d at 289 (noting that the "'unfair

CLASS ACTION COMPLAINT

business practices claim must be evaluated from the vantage of a reasonable consumer.'") (quoting *Haskell*, 857 F. Supp. at 1399). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id*. (quoting *Bank of the West*, 2 Cal. 4th at 1267).

171.    To meet the heightened pleading standard of Fed. R. Civ. P. 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud. *See e.g.*, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)).

172.    Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including, but not limited to, in the following ways:

(a)    knowingly and intentionally misrepresenting that the Digital Asset Securities sold on Defendants platforms were not securities under state or federal law;

(b)    knowingly and intentionally concealing that Defendants did not, as required by law, register the Digital Asset Securities sold on Defendants' platforms with the necessary state and federal regulatory entities; and,

(c)    knowingly and intentionally concealing that Defendants did not, as required by law, register Defendant Coinbase's business itself with the necessary state and federal regulatory entities.

173.    Defendants not disclose that Defendants purposefully avoided registering its business and the Digital Asset Securities products with the necessary (state) regulatory bodies. Plaintiffs would have found it material to their decisions to purchase Digital Asset Securities to

CLASS ACTION COMPLAINT

know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

174.    The facts that the Defendants concealed were material to the decisions of Plaintiffs and Class members about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

175.    Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. See *In re Carrier IQ*, 78 F. Supp. 3d at 1113-14 ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants. [] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit.") (internal citation omitted); *see also In re Solara Med. Supplies*, 613 F. Supp. 3d at 1303 ("a duty to disclose based upon Defendant's exclusive knowledge of the alleged inadequacy of its security measures. Plaintiffs adequately allege that the omission was a material fact.").

176.    Defendant Coinbase's misleading omissions concerning the Digital Asset Securities offered on its platforms relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall v. SeaWorld Ent., Inc*., 747 F. App'x 449, 451 (9th Cir. 2018) (quoting *Hodsdon v. Mars, Inc*., 891 F.3d 857, 863 (9th Cir. 2018)). That is the case here.

CLASS ACTION COMPLAINT

177.    Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

178.    Defendants intended for Plaintiffs and Class members to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

179.    Had any of Defendants disclosed the omitted information, Plaintiffs and Class members, would have been aware of it because they follow, directly or indirectly, the social media accounts of and news reports on, Defendants Coinbase and Armstrong.

180.    As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

181.    Taken together, Coinbase's omissions contributed to the deceptive marketing and advertising tactics as a whole, which were used to induce customers to use the Coinbase platforms to purchase the Digital Asset Securities.

182.    In the event that Plaintiffs' broker-dealer and money transmitter claims under California and Florida securities laws are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

183.    Additionally, Plaintiffs and Class members lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL.

184.    The lack of an adequate remedy at law entitles Plaintiffs and Class members to pursue equitable restitution under the UCL.

185.    Concurrently, "restitution under the CLRA or UCL would be more certain, prompt, or efficient than the legal remedies they request[,]" available with state securities and consumer law claims here. *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Am. Life Ins. Co.*, 300 U.S. at 214). As an example, the price premium damages model would likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

186.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed.

**COUNT V**
**Florida Securities and Investor Protection Act**
**FLA. STAT. §517.07**
**(Sale of Unregistered Securities)**
**Against All Defendants**

187.    Plaintiff Foy repeats and realleges each and every allegation contained above as if fully set forth herein.

188.    Plaintiff Foy is a resident of the State of Florida.

189.    Plaintiff Foy paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

190.    Plaintiff Foy brings this claim individually, and on behalf of the members of the Florida Subclass, against all Defendants.

191.    The Coinbase Digital Asset Securities are "securities" within the meaning of the term as defined by FLA. STAT. § 517.021.

192.    Defendants by engaging in the conduct described above, directly or indirectly, sold and offered to sell securities in Florida.

193.    Plaintiff Foy, and the members of the purported Class, purchased Coinbase Digital Asset Securities from Defendants.

194.    Section 517.07(1) of the Florida Statutes provides that it is unlawful and a violation for any person to sell or offer to sell a security in the State of Florida unless the security is exempt under Florida Statute § 517.051, is sold in a transaction exempt under Florida Statute §517.061, is a federally covered security, or is registered pursuant to Chapter 517 of the Florida Statutes.

195.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." FLA. STAT. § 517.211(1).

196.    The Coinbase Digital Asset Securities sold and offered for sale to Plaintiffs and Class members were not:

(a)    exempt from registration under FLA. STAT. § 517.051;

(b)    a federal covered security;

(c)    registered with the OFR; nor

(d)    sold in a transaction exempt under FLA. STAT. § 517.061.

CLASS ACTION COMPLAINT

197.    Defendants Coinbase Global and Coinbase, Inc., by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities (in Florida).

198.    Plaintiffs and Class members purchased Digital Asset Securities from Defendants Coinbase Global and/or Coinbase, Inc.

199.    Digital Asset Securities were provided and/or sold into the various Digital Asset Securities liquidity pools by Defendants Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and Class members made their Digital Asset Securities purchases from liquidity pools on Coinbase, privity between Defendants Coinbase Global and/or Coinbase, Inc. and Plaintiffs and Class members is established (even in the absence of a direct contract linking the two parties).

200.    Privity also exists between the issuers and suppliers of the liquidity in the pool (e.g., Defendants Coinbase Global and/or Coinbase, Inc.) and all those making purchases (e.g., Plaintiffs and Class members) from the Coinbase platforms because these Defendants are receiving the benefit of a fee (variable buying fee and/or a 1.49% selling fee) per Digital Asset transaction on that platform.

201.    By reason of the foregoing, each of the Defendants have violated Section 517.07 of the Florida Statues.

**COUNT VI**
**FLA. STAT. FLA. STAT. § 517.211**
**(Unregistered Dealer)**
**Against Defendants Coinbase Global and Coinbase, Inc.**

202.    Plaintiff Foy repeats and realleges each and every allegation contained above as if fully set forth herein.

203.    Plaintiff Foy is a resident of the State of Florida.

44

204.    Plaintiff Foy paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

205.    Plaintiff Foy brings this claim individually, and on behalf of the members of the Florida Subclass, against Defendants Coinbase Global and Coinbase, Inc.

206.    At all relevant times there was in full force and effect the Florida Securities and Investor Protection Act (FSIPA), which prohibits, among other things, any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. *See* FLA. STAT. § 517.12(1). Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. FLA. STAT. § 517.211.

207.    When issued, the Digital Asset Securities were securities within the meaning of the FSIPA. *See* FLA. STAT. § 517.021(22). Defendant Coinbase transacted business as a dealer when it offered or sold the Digital Asset Securities to Plaintiff Foy, and other Florida Subclass members, in Florida. *See* FLA. STAT. § 517.021(6).

208.    Further, FSIPA provides for the registration of "paper" (i.e., securities), at § 517.07(1) as follows: "It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under s. 517.051, is sold in a transaction exempt under s. 517.061, is a federal covered security, or is registered pursuant to this chapter." FLA. STAT. § 517.07(1).

209.    The Digital Asset Securities were not registered in Florida. The Digital Asset Securities were not exempt from registration. Defendant Coinbase is strictly liable to Plaintiff

45

Foy, and the Florida Subclass, for recessionary damages as provided in FLA. STAT. § 517.211, and those damages are "automatic." *See Skurnick v. Ainsworth*, 591 So. 2d 904, 905 (Fla. 1991).

210.    In addition to requiring that the "paper" be registered, FSIPRA also provides at § 517.12 for the registration of "people" as follows: "No dealer or associated person shall sell or offer for sale any securities in or from offices in this state or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person is registered with the office as a dealer or as an associated person of a dealer pursuant to this section." FLA. STAT. § 517.12(1).

211.    Defendant Coinbase transacted business as a dealer in Florida, including without limitation through solicitations directed by Defendant Coinbase to Florida and received in Florida.

212.    Defendant Coinbase was not registered as a dealer in Florida, nor was it subject to any exemption from registration for the Digital Asset Securities.

213.    Accordingly, Defendant Coinbase has violated FSIPRA by transacting business as an unregistered dealer in the sale of securities in Florida.

214.    Plaintiffs and Class members therefore seek all available and appropriate relief available under the FSIPRA, including recission and/or damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Defendants' platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

CLASS ACTION COMPLAINT

**COUNT VII**
**FLA. STAT. FLA. STAT. §517.301**
**(Negligence in Connection with the Purchase and Sale of an Investment)**
**Against All Defendants**

215.     Plaintiff Foy repeats and realleges each and every allegation contained above as if fully set forth herein.

216.     Plaintiff Foy is a resident of the State of Florida.

217.     Plaintiff Foy paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

218.     Plaintiff Foy brings this claim individually, and on behalf of the members of the Florida Subclass, against Defendants Coinbase Global and Coinbase, Inc.

219.     At all relevant times there was in full force and effect FSIPRA which has various provisions that govern the rendering of any investment advice or the offer, sale, or purchase of any investment or security.

220.     Defendant Coinbase had a duty to disclose to Plaintiffs and the Class that the Digital Asset Securities were not registered under FSIPA.

221.     FLA. STAT. § 517.301 defines an "investment" as "any commitment of money or property principally induced by a representation that an economic benefit may be derived from such commitment[.]" FLA. STAT. § 517.301(2) (non-applicable exceptions omitted).

222.     FLA. STAT. § 517.301 makes it unlawful to "employ any device, scheme, or artifice to defraud" and to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person" in "connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly."

47

FLA. STAT. § 517.301(1)(a)(1), (3). It is also unlawful to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration. FLA. STAT. § 517.301(1)(b). Florida law also prohibits knowingly and willfully falsifying, concealing, or covering up "by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation," or making or using a false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. FLA. STAT. § 517.301(1)(c).

223.    "The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that the scienter requirement under Florida law is satisfied by [a] showing of mere negligence.'" *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (quoting *Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004)).

224.    As alleged throughout this complaint, Defendants directly engaged in a common plan, scheme, and unlawful conduct to promote and sell the Digital Asset Securities, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, Class members, and/or their agents.

225.    Defendants also made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and their agents. Indeed, Coinbase continuously marketed (and markets) Digital Asset Securities to Plaintiffs, Class

members, and other investors as investments. Worse yet, Defendants state and imply that Coinbase entities and the Digital Asset Securities were properly registered with the appropriate regulatory authorities while failing to disclose that Defendant Coinbase's sales of the Digital Asset Securities violated (Florida state) law.

226.    In violation of FLA. STAT. § 517.301, Defendant Coinbase disseminated, among other outreach efforts, weekly newsletters to investors which misrepresented the Coinbase Digital Asset Securities as *not* securities. Similarly, the Coinbase User Agreement misstates that Coinbase "does not offer securities services in the United States or to U.S. persons."

227.    Further, Defendant Coinbase's own website published a blog post by Defendant Coinbase's Chief Legal Officer, Paul Grewal, entitled "Coinbase does not list securities. End of story." which summed up the post to investors in a "too long, didn't read" style "TLDR: Coinbase does not list securities on its platform. Period."[27]

228.    The purpose and effect of Defendants' scheme, plan, and unlawful conduct was, among other things, to conceal Defendants' wrongdoing and obscuring Defendant Coinbase's financial interests in the sale of the Digital Asset Securities. Defendants, pursuant to the scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, or participated in the preparation, issuance, and distribution of deceptive and materially misleading statements and omissions to Plaintiffs, Class members, and/or their agents.

229.    Defendants are jointly and severally liable to Plaintiff Foy and Florida Subclass members for their participation in or aiding in the purchase or sale of unregistered securities in violation of FLA. STAT. § 517.301 as discussed throughout this complaint. FLA. STAT. § 517.211(2).

---

[27] https://www.coinbase.com/blog/coinbase-does-not-list-securities-end-of-story.

CLASS ACTION COMPLAINT

230.    Plaintiff Foy and Florida Subclass members are entitled to recission of securities still owned, or for damages for securities Plaintiff Foy and the Florida Subclass have sold, as available pursuant to FLA. STAT. § 517.301, interests, costs, and attorneys' fees pursuant to FLA. STAT. § 517.211.

**COUNT VIII**
**Florida's Civil Remedies for Criminal Practices Act**
**FLA. STAT. FLA. STAT.  §772**
**(Florida RICO Act)**
**Against All Defendants**

231.    Plaintiff Foy repeats and realleges each and every allegation contained above as if fully set forth herein.

232.    Plaintiff Foy is a resident of the State of Florida.

233.    Plaintiff Foy paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

234.    Plaintiff Foy brings this claim individually, and on behalf of the members of the Florida Subclass, against all Defendants.

235.    This claim is brought on behalf of the Class against Defendants for actual damages, treble damages, and equitable relief under the Florida RICO Act. *See* FLA. STAT. § 772.104(1-2).

236.    Defendants are "person[s]" within the meaning of FLA. STAT. § 1.01(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of the Florida RICO Act.

237.    Plaintiff Foy and Florida Subclass members are each "persons," as that term is defined in FLA. STAT. § 1.01(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

CLASS ACTION COMPLAINT

238.    A RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has:

a.    a common purpose;

b.    relationships among those associated with the enterprise; and

c.    longevity sufficient to pursue the enterprise's purpose.

Defendants formed such an association-in-fact enterprise, namely, the Coinbase Digital Asset Securities Enterprise.

239.    The Coinbase Digital Asset Enterprise is ongoing and continuing business organizations consisting of "persons" that created and maintained systematic links for a common purpose: to ensure that Defendants could facilitate the sale of unregistered securities on the Coinbase platform and collect significant ongoing fees on the purchase and sale of Digital Asset Securities to retail investors at artificially inflated prices.

240.    To accomplish this purpose, the Coinbase Digital Asset Enterprise systematically promoted the Digital Asset Securities — either affirmatively or through half-truths and omissions — to retail investors, including Plaintiff Foy and the Subclass, that the Digital Asset Securities had been vetted and approved by state and/or federal regulatory authorities. The Coinbase Digital Asset Enterprise concealed from investors, like Plaintiff Foy and the Florida Subclass members, that the Digital Asset Securities were not the sound investment that Defendants claimed.

241.    The scheme of the Coinbase Digital Asset Enterprise translated into increased volume and more Digital Asset Securities investors buying at artificially inflated prices for the Defendants.

242.    The entities engaged in the Coinbase Digital Asset Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities,

CLASS ACTION COMPLAINT

as spearheaded by the executive officers and directors at each, respectively. There is regular communication between the Defendants, in which information is shared. Typically, this communication occurred (and occurs), through the use of the wires and the mail in which Defendants share information regarding various timing and content of promotional and/or listing activities for the Digital Assets Securities. Defendants, through their administration, funding, and execution of the scheme to misleadingly market the Digital Assets Securities, each functioned as a continuing unit for the purposes of implementing, respectively, the Digital Asset Securities scheme and, as set forth throughout this complaint, when issues arose during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

243.    During the time that the Digital Asset Securities were being launched and first publicly marketed to retail investors, Defendants were knowing and willing participants in various misleading marketing, advertising, and promotions of the Digital Asset Securities, and reaped lucrative profits from that conduct. Defendants knew, but did not disclose, that they were allowing the issuers of the Digital Asset Securities to engage in this fraud to the detriment of retail investors—Plaintiff Foy and the Florida Subclass.

244.    Defendants participated in the conduct of the Coinbase Digital Asset Enterprise, sharing the common purpose of inflating the price and trading volume of the Digital Asset Securities in order to generate substantial profits from transaction fees, through a pattern of racketeering activity within the meaning of the Florida RICO Act, which includes multiple instances of violations of FLA. STAT. §5 17. In the Coinbase Digital Asset Enterprise, the Defendants knowingly made material misstatements and/or omissions to retail investors in furtherance of the fraudulent scheme regarding:

a.    the regulatory approval of Digital Asset Securities;

b.  ownership interests of Defendants in the Digital Asset Securities; and

c.  the Defendants' intent to promote and facilitate the sale the Digital Asset Securities after artificially inflating the price and volume of trading.

245.    The Coinbase Digital Asset Enterprise engaged in and affected interstate commerce because, among other things, it created the Digital Asset Securities markets that were paid for by thousands of Class members throughout the United States, including the Florida Subclass.

246.    The complaint evidences that the Defendants were each willing participants in the Coinbase Digital Asset Enterprise, that the Coinbase Digital Asset Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Coinbase Digital Asset Enterprise's purpose coupled with the misleading promotion of the Digital Asset Securities.

247.    During the Class Period, the Defendants exerted control over the Coinbase Digital Asset Enterprise and participated in the operation or management of the affairs of the Coinbase Digital Asset Enterprise, directly or indirectly, in the following ways:

a.  Defendants were directly responsible for the decision to list, promote, and trade unregistered securities on the Coinbase platforms;

b.  Defendants concealed that they were causing the Digital Asset Securities price and volume to artificially inflate in order to allow themselves to collect lucrative fees on each trade made on Coinbase platforms and to sell off their respective Digital Asset Securities holdings at inflated prices; and

c.  Defendants expected and intended that the marketing materials would (and did) get distributed through the U.S. mail and interstate wire facilities, communications that failed

CLASS ACTION COMPLAINT

to disclose that the Defendants were artificially pumping up price and volume of the Digital Asset Securities.

248.    The scheme had a hierarchical decision-making structure that was headed by the Defendants. They controlled the listing of the Digital Asset Securities and directed the Defendant Coinbase to misleadingly promote the Digital Asset Securities to investors.

249.    The scheme devised and implemented by the Defendants amounted to a common course of conduct intended to: (a) allow the Defendants to artificially inflate the price and trading volume of the Digital Asset Securities; and (b) collect lucrative fees from those transactions at the expense of Plaintiff Foy, the Florida Subclass, and the Class members more generally.

### Defendants' Pattern of Racketeering Activity

250.    The Defendants conducted and participated in the conduct of the affairs of the Coinbase Digital Asset Enterprise through a pattern of racketeering activity. The pattern of racketeering activity by the Coinbase Digital Asset Enterprise likely involved thousands of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the unlawful digital asset solicitation scheme. Each of these fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of the Florida RICO Act. Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of the Florida RICO Act, through which the Defendants intended to and did defraud Plaintiff Foy, Florida Subclass members, and Class members more generally.

251.    Each instance of racketeering activity alleged throughout this complaint was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff Foy, Florida Subclass members, and Class members more generally.

CLASS ACTION COMPLAINT

252.    Defendants calculated and intentionally crafted the Coinbase Digital Asset Enterprise to ensure their own profits and income remained high, without regard to the impact such behavior had on Plaintiff Foy, Florida Subclass members, and Class members more generally, who were buying the Digital Asset Securities at artificially inflated prices.

253.    By intentionally and artificially inflating the Digital Asset Securities prices and trading volume, and then subsequently failing to disclose such practices to investors, the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

254.    The pattern of racketeering activity alleged throughout this complaint continues to the present.

### The Defendants' Use of the U.S. Mail and Interstate Wire Facilities

255.    The Coinbase Digital Asset Securities Enterprise engaged in and affected interstate commerce because it transmitted and published false and misleading information concerning, among other things, the growth potential for Digital Asset Securities across state lines.

256.    During the Class Period, the Coinbase Digital Asset Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state and international boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. mail and interstate wire facilities.

257.    The nature and pervasiveness of the Coinbase Digital Asset Enterprise's scheme, which was orchestrated by the Defendants and their executives including Defendant Armstrong, necessarily required direct and frequent communication by U.S. mail and interstate wire facilities.

CLASS ACTION COMPLAINT

258.    Many of the precise dates of the Coinbase Digital Asset Enterprise's uses of the U.S. mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants. Certainly, an essential part of the successful operation of the Coinbase Digital Asset Enterprise alleged throughout this complaint, depended upon secrecy.

259.    However, Plaintiffs can, and do below, generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.

260.    The Defendants' use of the U.S. mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved hundreds to thousands of communications throughout the Class Period including, among other things:

a.  Communications on official Coinbase accounts on various social media platforms, including, among other platforms: X (formerly known as Twitter), Telegram, Discord, and Reddit;

b.  Written representations and telephone calls between the Defendants and the moderators of Defendant Coinbase's social media accounts regarding the promotion of the Digital Asset Securities and the financial benefits to the Defendants for doing so;

c.  Emails between Defendants and their respective directors, officers, and other employees, agreeing to or effectuating the implementation of the Coinbase Digital Asset Enterprise scheme;

d.  Written and oral communications directed to retail investors (Class members) which fraudulently misrepresent, among other things, the growth potential for the Digital Asset

CLASS ACTION COMPLAINT

Securities that were designed to conceal the scheme and deter investigations into the Coinbase Digital Asset Enterprise; and

e.    Receipts of increased profits sent through the U.S. mail and interstate wire facilities — the wrongful proceeds of the scheme.

261.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Defendants involved in the scheme that others would distribute publications through the U.S. mail and by interstate wire facilities, and in those publications, conceal that the Digital Asset Securities prices and volumes were fraudulently inflated.

***Motive and Common Purpose***

262.    The Defendants' motive and purpose in creating and conducting the scheme and the Coinbase Digital Asset Enterprise was to increase the price and trading volume for the Digital Asset Securities so that Defendants could collect fees on each transaction on Coinbase platforms, as well as allowing insiders like Defendant Armstrong to sell off allocations from the Defendants' Digital Asset Securities at grossly inflated prices.

263.    Each person joined in the common purpose. Each person made more money the higher the Digital Asset Securities price rose and as trading volume increased the Defendants would be able to sell off in the increased liquidity while collecting ever-greater transactions fees.

***Damages Caused by the Defendants' RICO Activities***

264.    The Defendants' violations of state and federal law and the pattern of racketeering activity directly and proximately caused Plaintiffs and Class members to be financially injured as a result of purchasing the Digital Asset Securities, and at their inflated price and volumes.

265.    As described throughout this complaint and above in this count, when the Defendants executed the Digital Asset Securities promotional scheme, the result flooded the

market with unregistered securities for sale, which allowed Defendants to collect significant fees from every transaction as well as allowing Coinbase insiders, like Defendant Armstrong, to sell various allocations of the Digital Asset Securities. When the Digital Asset Securities price and trading volume is artificially inflated, investors, like Plaintiffs and Class members, overpay due to a fraudulent price and excess fees.

266.    Plaintiffs' and Class members' injuries were proximately caused by the Defendants' racketeering activity. But for the misleading statements and omissions made by the Defendants, Plaintiffs and Class members would have paid less for the Digital Asset Securities if they would have bought them at all.

267.    Plaintiffs' and Class members' injuries were directly caused by the Defendants' racketeering activity. The Defendants' racketeering activity inflated the Digital Asset Securities price and volume, which was ultimately paid for by Plaintiffs and Class members.

268.    Plaintiffs and Class members were directly harmed by the fraud.

269.    By virtue of these violations of the Florida RICO Act, the Defendants are liable to Plaintiff Foy, the Florida Subclass, and Class members more generally for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT IX
### Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA")
### FLA. STAT., § 501.211(1)
### Against Defendants Coinbase Global and Coinbase, Inc.

270.    Plaintiff Foy repeats and realleges each and every allegation contained above as if fully set forth herein.

271.    Plaintiff Foy is a resident of the State of Florida.

272.    Plaintiff Foy paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

273.    Plaintiff Foy brings this claim individually, and on behalf of the members of the Florida Subclass, against all Defendants.

274.    Plaintiff Foy and Florida Subclass members conferred a monetary benefit on Defendants as a result of the fees paid to Defendants for transactions on Coinbase platforms.

275.    Plaintiff Foy paid for or purchased Digital Asset Securities in Florida, and thus the deceptive transactions alleged herein occurred in Florida.

276.    FDUTPA, FLA. STAT. § 501, is to be liberally construed to protect the consuming public, such as Plaintiffs and Class members in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, such as Defendants in this case.

277.    Plaintiffs and Class members are "consumers" within the meaning of FLA. STAT. § 501.203(7).

278.    By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of FLA. STAT. § 501.203(8).

279.    "The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

280.    Under FDUTPA, "The Florida Supreme Court has noted that 'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "Under Florida law, an objective test is employed in determining

whether the practice was likely to deceive a consumer acting reasonably. That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Carriuolo*, 823 F.3d at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000)).

281.    A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 n.2 (S.D. Fla. 2021) ("This case was brought under California's consumer protection laws, which apply the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

282.    Plaintiff Foy and the Florida Subclass members reasonably relied on the misleading solicitations and omissions alleged herein when deciding to purchase various Digital Asset Securities.

283.    To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *see also CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, at *4 (11th Cir. July 29, 2022).

284.    Defendants engaged in business acts and practices deemed "deceptive" because of the actions, conduct, statements, and omissions described throughout this complaint including above in this section, which include, among other things, failing to disclose that the Digital Asset Securities were, in fact, unregistered securities subject to regulation by various federal and state regulatory agencies authorities.

285.    These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity

CLASS ACTION COMPLAINT

to deceive consumers, such as Plaintiffs and Class members, into investing in the Digital Asset Securities to their financial detriment, individually and collectively. Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers—Plaintiffs and Class members.

286.    Had any of Defendants disclosed the omitted information, Plaintiff Foy and Florida Subclass members (as well as other Class members), would have been aware of it because they follow, directly or indirectly, the social media accounts of and news reports on, Defendants Coinbase and Armstrong.

287.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff Foy and Florida Subclass members, suffered damages. The activities of the Defendants caused Plaintiff Foy and Florida Subclass members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

288.    The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiff Foy and Florida Subclass members, which would have likely deceived a reasonable person under the circumstances.

289.    Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiff Foy and Florida Subclass members) by their authorized agents.

290.    As a result of the false representations and violations of the laws described above, Plaintiff Foy and Florida Subclass members have been damaged by, among other things, overpaying for the Digital Asset Securities that were artificially inflated by Defendants as well as paying transactions fees associated with their trades on the Coinbase platforms.

291.    Taken together, the misleading actions, statements, and omissions of Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit transactions of Digital Asset Securities.

292.    Plaintiff Foy and Florida Subclass members seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

293.    Pursuant to FLA. STAT. §§ 501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually, and on behalf all others similarly situated, prays for judgment and relief as follows:

(a)    determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b)    requiring Defendants to pay actual, general, special, incidental, statutory, punitive, and consequential damages sustained by Plaintiffs and the Class and award all restitution to which Plaintiffs and the Class are entitled, by reason of the acts, omissions, and transactions alleged herein;

(c)    awarding Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other court costs; and

(d)    awarding Plaintiffs and other Class members such other and further relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 4, 2024                    **THE ROSEN LAW FIRM, P.A.**

                                       */s/ Laurence M. Rosen*
                                       Laurence M. Rosen (SBN 219683)
                                       355 South Grand Avenue, Suite 2450
                                       Los Angeles, CA 90071
                                       Telephone: (213) 785-2610
                                       Facsimile: (213) 226-4684
                                       Email: lrosen@rosenlegal.com

                                       *Counsel for Plaintiffs*

CLASS ACTION COMPLAINT